Nathaniel K. Charny (NC 5664)
H. Joseph Cronen (HC 4814)
Charny & Wheeler P.C.
9 West Market Street
Rhinebeck, New York 12572
Tel - (845) 876-7500
Fax - (845) 876-7501
ncharny@charnywheeler.com
jcronen@charnywheeler.com

Attorneys for Plaintiff Derek Trivelli

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEREK TRIVELLI, | |
| Plaintiff, | COMPLAINT |
| v. | Civil Action No. |
| PUTNAM HOSPITAL CENTER, | JURY TRIAL DEMANDED |
| Defendant. | |

Plaintiff complains, upon knowledge as to himself and his own acts, and upon information and belief as to all other matters, as follows.

INTRODUCTION

1.     This action is brought by Plaintiff Derek Trivelli against his former employer, Defendant Putnam Hospital Center.

2.     Plaintiff complains pursuant to the New York State Human Rights Law ("NYSHRL"), New York State Executive Law § 290, et seq.  Plaintiff seeks damages to redress the injuries Plaintiff has suffered as a result of being discriminated against on the basis of Plaintiff's disability and retaliated against for engaging in protected activity, resulting in Plaintiff's unlawful termination.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b), because the events giving rise to Plaintiff's claims occurred in this judicial district.

## PARTIES

5. Plaintiff Derek Trivelli resides in and is a citizen of the State of Connecticut.

6. Defendant Putnam Hospital Center is a not-for-profit corporation with headquarters located at 1351 Route 55, Suite 200, LaGrangeville, New York 12540.

7. Defendant Putnam Hospital Center is organized under the laws of the State of New York.

8. Defendant Putnam Hospital Center is a citizen of the State of New York.

9. Defendant Putnam Hospital Center owns and/or operates a 164-bed, acute care hospital located at 670 Stoneleigh Avenue, Carmel, New York 10512 (at times the "Hospital").

## FACTS

### Definitions

10. <u>Radiation Protection Lead Units</u>. Radiation protection lead units shield patients and personnel from unnecessary X-ray radiation exposure from diagnostic radiology procedures.

11. Radiation protection lead units are protective garments and include lead aprons, skirts, and thyroid shields.

12. Radiation protection lead units that contain holes or tears in them pose a significant safety risk to personnel and patients that are wearing them.

13.     <u>Fluoroscopy</u>.  Fluoroscopy is a type of medical imaging that shows a continuous X-ray image on a monitor, similar to an X-ray "movie."  A continuous X-ray beam is passed through the body part being examined.  The beam is transmitted to a TV-like monitor so that the body part and its motion can be seen in detail.

14.     Fluoroscopy can also be used to determine the integrity of radiation protection lead units because it reveals any holes or tears in the lead.

15.     <u>Ionizing Radiation</u>.  According to the United States Nuclear Regulatory Commission ("NRC"), ionizing radiation is a form of radiation that includes alpha particles, beta particles, neutrons, gamma rays, and X-rays.

16.     Ionizing radiation is capable of producing ions and is considerably more energetic than non-ionizing radiation such as radio- or microwaves.

17.     When ionizing radiation passes through material such as living tissue, it deposits enough energy to produce ions by breaking molecular bonds and displacing (<u>i.e.</u>, removing) electrons from atoms or molecules.  This electron displacement may lead to changes in living cells.  Given this ability, ionizing radiation has a number of beneficial uses.

18.     However, ionizing radiation is potentially harmful if not used correctly, and high doses may result in severe skin or tissue damage.

19.     <u>Radiation Badges</u>.  Radiation badges or radiation dosimeters measure a person's occupational radiation dose.

20.     There are many different types of radiation badges and the type of badge someone wears and where someone wears it depends upon the type of work the individual does and their work environment.

21. For example, a person may wear a body dosimeter at their chest level if she works in nuclear medicine.

22. For another example, a person may wear a ring dosimeter, used for measuring the beta and gamma dose to their hand, on the hand which is closest to the radiation source.

23. <u>Nuclear Medicine</u>. Nuclear medicine is a specialized area of radiology that uses very small amounts of radioactive materials, or radiopharmaceuticals, to examine organ function and structure.

24. Nuclear imaging is a branch of radiology that enables visualization of organ and tissue structure as well as function.

<u>Background</u>

25. Plaintiff's training and educational background is in nuclear medicine technology.

26. Plaintiff earned an Associate's Degree in Nuclear Medicine Technology from Molloy College.

27. Plaintiff is certified by the American Registry of Radiologic Technologists in Nuclear Medicine Technology and the Nuclear Medicine Technology Certification Board.

28. On or about November 9, 2014, Plaintiff became a Radiology Supervisor at Defendant Putnam Hospital Center, a position he held until his unlawful termination on November 20, 2017.

29. As Radiology Supervisor, Plaintiff reported to Richard Hvisch, Radiology Director at Defendant Putnam Hospital Center, and April Lividini, Radiology Manager at Defendant Putnam Hospital Center.

30. As a Radiology Supervisor at Defendant Putnam Hospital Center, Plaintiff's job responsibilities primarily included supervising outpatient radiology and dealing with patient complaints in that regard.

31. Plaintiff also at times performed the duties of a Nuclear Medical Technologist, by, for example, injecting nuclear isotopes into patients and using a camera that did not emit ionizing radiation to view the area(s) of the body that the isotopes had traveled through.

32. However, as Radiology Supervisor, Plaintiff's job responsibilities did not include performing fluoroscopies.

33. Plaintiff's expertise is in nuclear medicine not X-rays.

34. Prior to the events at issue here, Plaintiff had never used a fluoroscopy machine, was never trained on conducting fluoroscopies, was never provided training on appropriate protective gear and was never provided training on the appropriate radiation badges.

35. Plaintiff's duties and obligations under both his licensure and his assigned duties and responsibilities while employed by Defendant Putnam Hospital Center also included ensuring compliance with workplace safety obligations.

The Fluoroscopy Assignment:
Plaintiff Is Ordered to Perform Fluoroscopies On
<u>All of Defendant Putnam Hospital Center's Radiation Protection Lead Units</u>

36. On or about September 26, 2017, Ms. Lividini assigned Plaintiff to perform fluoroscopies on all of Defendant Putnam Hospital Center's radiation protection lead units which included hundreds of lead aprons, skirts, and thyroid shields.

37. Plaintiff believed these radiation protection lead units were used by both patients and personnel in the operating room.

38. On October 4-5, 2017, Plaintiff performed fluoroscopies on more than 100 separate radiation protection lead units.

39. This was an arduous task that he completed over two days consisting of shooting thousands of fluoroscopies on large lead units.

40. Plaintiff was not sufficiently trained in using a fluoroscopy machine.

41. Plaintiff was assisted by Patient Care Technicians ("PCTs") who were also not sufficiently trained in using a fluoroscopy machine.

42. Plaintiff's review of the lead shields through fluoroscopy revealed that many of them, had holes, cracks, and tears in them.

43. In other words, the radiation protection lead units posed health and safety risks to anyone who wore them.

44. However, safety records pertaining to these radiation protection lead units showed that they had fluoroscopies performed on them approximately six months earlier and were recorded as "aok" (<u>i.e.</u>, showed no issues).

45. Plaintiff knew that this was inaccurate, as fluoroscopies had not been performed on these radiation protection lead units.

<u>Plaintiff's Disability; Plaintiff Suffers a Physical Reaction</u>

46. On October 9, 2017, an unusual rash developed on Plaintiff's neck and upper back.

47. As such, Plaintiff went to see his primary care physician.

48. Plaintiff's physician later diagnosed him with probable radiation exposure.

49. Plaintiff suffers from radiation poisoning/exposure.

50. Plaintiff's disability (radiation poisoning/exposure) constitutes (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, within the meaning of NYSHRL § 292(21).

51.  Plaintiff was at all material times qualified for his position.

52.  Plaintiff's disability, upon the provision of reasonable accommodations, did not prevent Plaintiff from performing in a reasonable manner the activities involved in his position with Defendant Putnam Hospital Center.

Plaintiff Complains to Human Resources That He Had Safety Concerns
With Respect to Performing Fluoroscopies on Radiation Protection Lead Units

53.  On October 20, 2017, Plaintiff requested a meeting with Anthony Iraola, a Human Resources Business Partner at Defendant Putnam Hospital Center, to discuss Plaintiff's concerns regarding the fluoroscopies.

54.  The same day that this meeting took place Mr. Iraola stressed that Plaintiff openly communicate his concerns to his supervisor, Ms. Lividini, by emailing her as soon as possible.

Plaintiff Complains to His Supervisor Regarding the Safety of
Plaintiff Performing Fluoroscopies on Radiation Protection Lead Units

55.  On October 23, 2017 at 1:26 pm, in accordance with the instructions from Defendant Putnam Hospital Center's Human Resources Department, Plaintiff emailed his supervisor, Ms. Lividini, expressing his safety concerns about performing the fluoroscopies.

56.  Specifically, Plaintiff (a) informed Ms. Lividini that he was "not comfortable performing the [fluoroscopies] without proper training on the machine"; (b) asked Ms. Lividini if he could receive help from an X-ray Technician, someone who was properly trained in fluoroscopies; and (c) asked Ms. Lividini for guidance as to whether Plaintiff should be wearing an X-ray badge to monitor his radiation exposure levels.

57.  Although Plaintiff had a radiation badge for nuclear medicine, it was Defendant Putnam Hospital Center's practice and/or policy that personnel who work with ionizing radiation not "mix" their badges.

58. For example, a worker should wear one badge to perform nuclear medicine and a different badge to perform an X-ray.

59. The reason for this practice is if the worker suffers an illness from radiation, they would know which type of radiation got them sick and where they were exposed.

Defendant Putnam Hospital Center's Own Physicist Confirms<br>Plaintiff's Fluoroscopy Assignment Was "Sketchy"

60. On October 23, 2017, the "sketchy" nature of Ms. Lividini's assignment of fluoroscopy to Plaintiff was confirmed by a text message sent from Defendant Putnam Hospital Center's Physicist who stated to Plaintiff that the assignment was "sketchy."

Defendant Putnam Hospital Center Disciplines Plaintiff Mere Hours After He Complains<br>to His Supervisor That the Fluoroscopy Assignment Posed Safety Risks

61. On October 23, 2017 at 4:30 p.m., only hours after Plaintiff's foregoing email to Ms. Lividini, Ms. Lividini issued a "written caution/verbal warning" to Plaintiff for being unprepared for a meeting that had taken place about one week prior on October 17, 2017.

62. This was the first time Plaintiff had been subject to any negative counseling as an employee of Defendant Putnam Hospital Center.

63. The next morning on October 24, 2017, Ms. Lividini sent an email insisting that, notwithstanding Plaintiff's workplace safety concerns, Plaintiff was to finish all of the fluoroscopies by October 31, 2017.

Plaintiff Complains to Defendant Putnam Hospital Center's Human Resources Department<br>That He Was Directed by His Supervisor to Perform Fluoroscopies<br>On Radiation Protection Lead Units Without Proper Training or Licenses

64. On October 23, 2017, Plaintiff emailed Kathryn Duras, Human Resources Director at Defendant Putnam Hospital Center, requesting a meeting regarding the foregoing events.

65. Ms. Duras replied that she was unavailable and recommended that Plaintiff meet instead with Mr. Iraola.

66. On October 24, 2017, as instructed by Ms. Duras, Plaintiff emailed Mr. Iraola and reported to him that on October 4-5, 2017 Plaintiff performed, at Ms. Lividini's behest, fluoroscopies on over 100 lead aprons, thyroid shields, and vests which took two days and hours of fluoroscopy time despite the fact that Plaintiff did not have a New York State license to perform this task or proper radiation safety training.

67. Plaintiff further reported that without the proper licenses and training Plaintiff and the PCTs were "put into direct danger of radiation exposure," that Plaintiff believed he developed a rash as a result, and that he was never issued an X-ray radiation badge to monitor his radiation level.

68. Plaintiff reported his concern that Ms. Lividini retaliated against him by issuing him a disciplinary warning only hours after he emailed her about his safety concerns.

**Plaintiff Meets with Defendant Putnam Hospital Center's Human Resources Personnel and Again Complains That He Was Directed By His Supervisor to Perform Fluoroscopies on Radiation Protection Lead Units Without Proper Training or Licenses**

69. On October 24, 2017, as a result of Plaintiff's foregoing email, Mr. Iraola and Ms. Duras agreed to meet Plaintiff.

70. During this meeting, which lasted for approximately one hour, Plaintiff again complained that he was required to perform thousands of fluoroscopies on Defendant Putnam Hospital Center's radiation protection lead units without (a) proper training on the fluoroscopy machine, (b) appropriate protective gear, and (c) training on the appropriate radiation badges.

71. Plaintiff again expressed his concern that he and others were likely exposed to radiation.

72.     Plaintiff also disclosed that fluoroscopies had not been performed on Defendant Putnam Hospital Center's radiation protection lead units in years.

73.     Plaintiff also disclosed that for the prior three years he was tasked with visually inspecting the radiation protection lead units and feeling them for bumps because he was not an X-ray Technician.

74.     In this regard, Plaintiff would pull lead units out of service when they failed his visual inspection and keep records of his inspections noting whether or not a lead was in fact "aok."

75.     Plaintiff also disclosed that Ms. Lividini kept Defendant Putnam Hospital Center's official records of the inspections of the radiation protection lead units, such records were created by Ms. Lividini without consulting Plaintiff or Plaintiff's records, such records stated that all the lead units were "aok," and that such records stated that fluoroscopies were performed on all of them even though that was not true.

76.     Plaintiff also disclosed that he believed Ms. Lividini falsified official safety records with respect to the fluoroscopy checks in case New York State audited or inspected the hospital.

Plaintiff's Medical Condition Worsens and Plaintiff's Treating Physician Needs
<u>Information; Plaintiff Requests a Reasonable Accommodation</u>

77.     On October 26, 2017, Plaintiff again saw his physician because he felt fatigued, had lost weight (a loss of ten pounds in a few weeks), and his skin condition had worsened.

78.     Plaintiff's physician advised Plaintiff to take leave from work until November 8, 2017 and gave Plaintiff an absence note.

79.     By requesting a leave of absence, Plaintiff requested a reasonable accommodation for his disability.

80. The physician also advised Plaintiff to ask Defendant Putnam Hospital Center for information regarding the possible radiation exposure.

81. This information -- regarding the possible radiation exposure -- was readily available to Defendant Putnam Hospital Center.

### Plaintiff Again Complains to Defendant Putnam Hospital Center's Human Resources Department That He Was Directed by His Supervisor to Perform Fluoroscopies on Radiation Protection Lead Units Without Proper Training or Licenses

82. On October 26, 2017, after Plaintiff attended a doctor's appointment concerning his exposure to radiation, Plaintiff emailed Mr. Iraola and Ms. Duras complaining that Ms. Lividini's "request for me to perform testing on the lead units using fluoroscopy is beyond my scope of practice and unethical" and is a breach of Defendant Putnam Hospital Center's code of conduct.

83. Plaintiff also requested information regarding how much radiation he was exposed to, the health risks of radiation exposure, and Defendant Putnam Hospital Center's whistleblower retaliation policies.

84. Defendant Putnam Hospital Center never responded to Plaintiff's requests.

85. On October 30, 2017, having heard no response to his inquiry regarding radiation exposure, Plaintiff emailed Ms. Duras and Mr. Iraola writing, "I'm not sure what to do at this point, please help."

86. Mr. Iraola responded stating "At this time, we cannot share any information with you.  Upon completion of our investigation and your return to work, we will meet."

### Plaintiff's Health Deteriorates Further and He Requests Additional Leave

87. On November 3, 2017, Plaintiff saw his physician again because his condition had worsened.

88. At that time, Plaintiff's physician diagnosed him with probable radiation exposure.

89. Plaintiff received a doctor's note stating that he should take leave from work until November 22, 2017.

90. Plaintiff immediately emailed the doctor's note to Defendant Putnam Hospital Center.

91. Plaintiff received no response from Defendant Putnam Hospital Center in regards to his doctor's note.

92. On November 9, 2017, having heard no response from Defendant Putnam Hospital Center, Plaintiff again emailed Ms. Duras and Mr. Iraola regarding the status of his request for information including information that had been requested by Plaintiff's treating medical provider.

<u>Defendant Putnam Hospital Center Unlawfully Terminates Plaintiff Because He Is Disabled</u>

93. On November 9, 2017, Defendant Putnam Hospital Center informed Plaintiff that no information will be forthcoming and, remarkably, that Plaintiff's inquiries constituted interference with the investigation.

94. On November 13, 2017, Plaintiff and Defendant Putnam Hospital Center exchanged emails regarding benefits during Plaintiff's medical leave of absence, concluding with Plaintiff asking explicitly that corporate compliance be included in the investigation, especially given Ms. Lividini's alleged falsification of safety records.

95. On November 16, 2017, as required by Defendant Putnam Hospital Center, Plaintiff visited his physician to obtain an authorization to return to work on November 21, 2017.

96. On November 20, 2017, the day before Plaintiff's expected return to work, Plaintiff was called into Defendant Putnam Hospital Center and summarily terminated from employment.

97. Defendant Putnam Hospital Center's contemporaneous written explanation is as follows:

> On October 24, 2017, Derek Trivelli made a complaint to HR, accusing April Lividini of requiring him to perform fluoroscopy tests on lead protective gear, which Derek stated was against his scope of practice. After a full investigation, it has been determined that Derek's complaints were not substantiated. Additionally, he falsified statements with regards to not being equipped to perform the task and not being properly trained in Radiation Safety. Derek violated H[ealth] Q[uest] Policy Rules of Conduct, Section B: Violations Resulting in Suspension and/or Immediate Discharge (Major Violations). Derek failed to be truthful regarding the investigation of his complaints. Derek continued to be disruptive and interfere with the investigation after being told multiple times he needed to stop continually calling HR and other Health Quest personnel making demands related to the investigation.

98. Defendant Putnam Hospital Center's contemporaneous written explanation is a mere pretext for discrimination and retaliation, as evidenced by the temporal proximity between Plaintiff's termination on November 20, 2017, and October 26, 2017, when Plaintiff first requested a reasonable accommodation for his disability.

<u>Defendant Putnam Hospital Center Considered Plaintiff an Exemplary Employee</u>

99. Plaintiff was an exemplary employee and was recognized as such through September 2017, mere weeks before Plaintiff disclosed his disability and requested a reasonable accommodation.

100. For example, on or about November 2, 2016, Peter Kelly, President of Defendant Putnam Hospital Center stated "Good progress. Let's keep it up. Thank you all." This was in

response to a patient's positive satisfaction report in which the patient commended Plaintiff's "outstanding job."

101. On or about April 19, 2017, a patient called because she "wanted Putnam Hospital Center and the necessary people to know just how [Plaintiff] has 'gone out of his way to accommodate' her and her needs" and wanted to "extend her 'many thanks for all his hard work!'" Plaintiff again received praise from Mr. Kelly who emailed him stating "Good news and nicely done Derek.  Thank you!"

102. For another example, on or about July 19, 2017, a patient, who is a nurse herself, emailed Mr. Hvisch stating, among other positive things, that Plaintiff is "a tremendous asset to the organization."

103. As a final example, on or about September 25, 2017, Plaintiff received "employee recognition" for "exemplary patient care."

104. The above are just some of the ways Defendant Putnam Hospital Center regularly and continually harassed, discriminated against, and retaliated against Plaintiff while employing Plaintiff.

105. Defendant Putnam Hospital Center treated Plaintiff this way because of Plaintiff's disability.

106. Defendant Putnam Hospital Center treated Plaintiff this way to retaliate against Plaintiff for engaging in protected activity.

107. Defendant Putnam Hospital Center acted intentionally and intended to harm Plaintiff.

108. Defendant Putnam Hospital Center unlawfully discriminated against, retaliated against, humiliated, degraded, and belittled Plaintiff. As a result, Plaintiff suffers loss of rights, emotional distress, and loss of income.

109. Plaintiff's performance was, upon information and belief, above average and satisfactory while working for Defendant Putnam Hospital Center.

110. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of employment, income, the loss of a salary, loss of bonus, loss of benefits, other compensation which such employment entails, special damages, and great inconvenience.

111. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

112. Defendant Putnam Hospital Center acted maliciously, willfully, outrageously, and with full knowledge of the law. As such, Plaintiff is entitled to punitive damages.

## FIRST CAUSE OF ACTION

## DISCRIMINATION IN VIOLATION OF
## NEW YORK STATE EXECUTIVE LAW § 296(1)

113. Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

114. New York State Executive Law § 296(1) provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

115. Defendant Putnam Hospital Center violated the section cited herein as set forth.

SECOND CAUSE OF ACTION

DISCRIMINATION IN VIOLATION OF
NEW YORK STATE EXECUTIVE LAW § 296(3)

116.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

117.   New York State Executive Law § 296(3)(a) provides that:

> It shall be an unlawful discriminatory practice for an employer, licensing agency, employment agency or labor organization to refuse to provide reasonable accommodations to the known disabilities, or pregnancy-related conditions, of an employee, prospective employee or member in connection with a job or occupation sought or held or participation in a training program.

118.   Defendant Putnam Hospital Center violated the section cited herein as set forth.

THIRD CAUSE OF ACTION

RETALIATION IN VIOLATION OF
NEW YORK STATE EXECUTIVE LAW § 296(7)

119.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

120.   New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

121.   Plaintiff engaged in protected activity by requesting medical leave.

122.   Defendant Putnam Hospital Center violated the section cited herein as set forth.

JURY DEMAND

123.      Plaintiff respectfully demands a trial by jury.

REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests relief as follows:

(A)     For actual, compensatory and general damages as well as statutorily available damages in an amount as shall be proven at trial;

(B)     For punitive damages;

(C)     For a medical monitoring program;

(D)     For equitable remedies, including removal of discriminatory disciplinary actions and all records of such actions, and training for management;

(E)     For attorney's fees and costs pursuant to statute;

(F)     For pre- and post-judgment interest on all amounts claimed; and

(G)     For such other and further relief as the Court deems just and proper.

Dated: Rhinebeck, New York
April 15, 2021

_/s/ Nathaniel K. Charny_
Nathaniel K. Charny (NC 5664)
H. Joseph Cronen (HC 4814)
Charny & Wheeler P.C.
9 West Market Street
Rhinebeck, New York 12572
Tel - (845) 876-7500
Fax - (845) 876-7501
ncharny@charnywheeler.com
jcronen@charnywheeler.com

Attorneys for Plaintiff Derek Trivelli